1  James C. Shah (SBN 260435)
   Email: jcshah@millershah.com
2  Kolin C. Tang (SBN 279834)
   Email: kctang@millershah.com
3  **MILLER SHAH LLP**
4  19712 MacArthur Blvd., Suite 222
   Irvine, California 92612
5  Telephone: (866) 540-5505
   Facsimile: (866) 300-7367
6

7  Christopher E. Roberts (phv forthcoming)
   Email: CRoberts@butschroberts.com
8  BUTSCH ROBERTS & ASSOCIATES LLC
   7777 Bonhomme Avenue, Suite 1300
9  Clayton, Missouri 63105
   Telephone: (314) 863-5700
10

11 *Attorneys for Plaintiff*

12                **IN THE UNITED STATES DISTRICT COURT**
13           **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
                       **WESTERN DIVISION**
14

| | |
|---|---|
| 15 ANGELA ANDERSON, individually and on behalf of others similarly situated, | Case No.: 2:24-cv-9101 |
| 16 | |
| 17 Plaintiff, | **CLASS ACTION COMPLAINT** |
| 18 v. | **JURY TRIAL DEMANDED** |
| 19 | |
| 20 S.USA LIFE INSURANCE COMPANY, INC. | |
| 21 | |
| 22 Defendant. | |

23

24

25

26

27

28

# CLASS ACTION COMPLAINT

COME NOW Plaintiff, Angela Anderson ("Plaintiff" or "Anderson"), individually, and on behalf of all others similarly situated, through her undersigned counsel, and for her Class Action Complaint against Defendant, S.Usa Life Insurance Company, Inc. ( "Defendant" or "S.Usa"), states as follows:

## INTRODUCTION AND BACKGROUND ON THE TCPA

1. Plaintiff brings this case to protect her privacy rights; namely, the right to be left alone from unwanted telemarketing phone calls.

2. Plaintiff brings this suit in an effort to stop telemarketers like Defendant from calling her and putative class (defined below) members' phones despite the fact that Plaintiff and the putative class members registered their phone numbers on the National Do-Not-Call Registry ("DNC List").

3. In 1991, after passage with bipartisan support in Congress, President George H.W. Bush signed the Telephone Consumer Protection Act ("TCPA") into law, to protect consumers' privacy rights; namely, the right to be left alone from unwanted telemarketing calls. A leading sponsor of the TCPA described unwanted telemarketing calls as "the scourge of modern civilization." 137 Cong. Rec. 30821 (1991).

4. The TCPA affords protections for people who registered their phone numbers on the DNC List. Specifically, the TCPA provides that each person who receives more than one call on their phone after being registered on the DNC List is entitled to recover a penalty of up to $500 per call, and up to $1,500 per call if the TCPA is willfully or knowingly violated. *See* 47 U.S.C. § 227(c)(1)(A); 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c).

5. Highlighting the problem of telemarketing in this country, from January 2024 through September 2024, approximately 38.8 billion robocalls were placed in the United States. RobocallIndex.com, YouMail Robocall Index, https://robocallindex.com/history/time (last visited October 2, 2024).

6.     Decades after the TCPA passed into law, it is still unfortunately the case that "month after month, unwanted telemarketing calls and texts top the list of consumer complaints received by the [Federal Communications] Commission." *Omnibus TCPA Order*, 30 FCC Rcd. 7961, 7964 (F.C.C. July 10, 2015).

7.     In fact, in 2023 alone, there were more than two million do-not-call complaints to the FTC about unwanted telemarketing calls.  Federal Trade Commission ("FTC"), *FTC Issues Biennial Report to Congress on the National Do Not Call Registry* (Jan. 8, 2024) *available at*: https://www.ftc.gov/news-events/news/press-releases/2024/01/ftc-issues-biennial-report-congress-national-do-not-call-registry (last visited October 4, 2024).

8.     The private right of enforcement of the TCPA is critical to stopping the proliferation of these unwanted telemarketing calls. For example, while the Federal Communications Commission ("FCC") levied more than $200 million in penalties against telemarketers between 2015 and 2018, it collected less than $7,000 of that amount. *See* Sarah Krouse, *The FCC Has Fined Robocallers $208 Million. It's Collected $6,790*, THE WALL STREET JOURNAL, March 28, 2019, https://www.wsj.com/articles/the-fcc-has-fined-robocallers-208-million-its-collected-6-790-11553770803.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over the TCPA claims in this action under 28 U.S.C. § 1331, which grants this Court original jurisdiction of all civil actions arising under the laws of the United States.

10.     Anderson is and at all times materials to this Complaint has resided in Los Angeles, California and has been a citizen of the State of California.

11.     This Court has personal jurisdiction over Defendant because it is licensed to sell insurance in California, transact business in California, and sell various insurance-related products and services in California.

12.     Defendant has continuous and systematic contacts with the State of

1    California, and attempted to sell its insurance products to Anderson, a citizen of the
2    State of California.

3        13.    Venue is proper under 28 U.S.C. §§ 1391(b)(2) as a substantial portion
4    of the events giving rise to the claims herein arose in this District.

5    **PARTIES**

6        14.    At all times relevant to this Complaint, Anderson was, and is still, the
7    owner of phone, bearing phone number 310-XXX-5417.

8        15.    Anderson registered her phone number on the DNC List on or about
9    August 17, 2010, to avoid receiving unwanted telemarketing communications.

10        16.    The monthly bill associated with Anderson's phone number is issued in
11    her name, and not in the name of a business.

12        17.    Anderson uses her cell phone primarily for residential purposes, such as
13    communicating with friends and family members.

14        18.    Defendant S.Usa is an Arizona corporation that is licensed to sell
15    insurance in the State of California.

16        19.    Defendant's insurance products are sold using in the name "Prosperity"
17    or "Prosperity Life."

18        20.    One of Defendant's websites is www.susa.com.

19        21.    Defendant's primary business is selling insurance products and services,
20    including, but not limited to, final expense insurance.

21        22.    Defendant markets its insurance products through a variety of marketing
22    tactics, including placing telemarketing calls to consumers.

23        23.    Anderson did not provide any form of consent to Defendant to contact
24    her on phone before she received the calls at issue.

25    **DEFENDANT'S AGENTS**

26        24.    Defendant has agents who market and sell its insurance products
27    throughout the United States.

28        25.    Defendant has the right to accept or decline applications for insurance

1  submitted by its agents if those applications do not meet certain criteria required by

2  Defendant.

3      26.    Defendant's website includes a "portal" through which its agents can

4  enroll as agents and login to receive and exchange information with Defendant.

5      27.    The "portal" also allows Defendant's agents to review their earnings and

6  commissions from Defendant.

7      28.    Defendant at times throughout the class period has paid its agents for

8  applications submitted to Defendant.

9      29.    On information and belief, Defendants retain the unilateral and absolute

10  right to control the use of their agents' marketing, including, but not limited to,

11  requiring approval before using Defendant's name or logo.

12      30.    On information and belief, any advertising or marketing method to be

13  used by an agent of Defendant's is subject to the approval of Defendant.

14      31.    On information and belief, Defendant's approval of marketing, including

15  the use of the name Prosperity and/or Prosperity Life and the term "final expense"

16  insurance" as it relates to Defendant's insurance products, extends to telemarketing.

17      32.    On information and belief, Defendant approved of the calls placed to

18  Anderson and the calls placed to the putative class members as described in this

19  Complaint.

20      33.    On information and belief, Defendant controls the geographic scope in

21  which its agents may sell their products, and for which these agents may receive

22  commissions.

23      34.    On information and belief, Defendant retains the right to instruct its

24  agents to not submit applications for insurance that were obtained from persons

25  whose phone numbers were on the DNC List at the time they were called by

26  Defendant's agents. Furthermore, Defendant has the right to refuse to sell their

27  insurance products to such persons.

28      35.    On information and belief, after its agents contacted persons on the DNC

1  List as described in this Complaint, Defendant sold insurance products to a number of
2  those persons and received premiums from those sales.

3       36.    Defendant underwrites the insurance policies marketed by its agents and
4  guarantees the policies.

5       37.    When an agent sells an insurance policy of Defendant to a consumer, the
6  premium is paid directly to Defendant. The agent that sold the policy then receives a
7  commission, which is paid by Defendant to the agent.

8  **<u>DEFENDANT'S CALLS TO PLAINTIFF</u>**

9       38.    Despite not applying for or requesting insurance from Defendant or
10  anyone acting on Defendant's behalf, nor being in the market for such products,
11  Anderson began receiving solicitation calls from or on behalf of Defendant.

12       39.    Anderson did not provide any form of consent to Defendant or anyone
13  acting on its behalf to contact her.

14       40.    Yet, on August 26, 2023, Anderson received a solicitation call from or
15  on behalf of Defendant. The caller stated that Anderson qualified for "state-regulated
16  final expense insurance" and identified the name US Funeral Expenses. Anderson
17  advised she was not interested. The call appeared on Anderson's phone as having
18  originated from phone number 279-233-1395.

19       41.    On September 1, 2023, Anderson received a solicitation call from or on
20  behalf of Defendant. The caller again stated that Anderson qualified for "state-
21  regulated final expense insurance" and identified the name US Funeral Expenses.
22  Anderson again advised she was not interested. The call appeared on Anderson's
23  phone as having originated from phone number 279-233-1367.

24       42.    On September 4, 2023, Anderson received a solicitation call from or on
25  behalf of Defendant. The caller again stated that Anderson qualified for "state-
26  regulated final expense insurance" and identified the name US Funeral Expenses.
27  Anderson again advised she was not interested. The call appeared on Anderson's
28  phone as having originated from phone number 279-233-1401.

43.     On September 5, 2023, Anderson received a solicitation call from or on behalf of Defendant. The caller again stated that Anderson qualified for "state-regulated final expense insurance" and identified the name US Funeral Expenses. Anderson again advised she was not interested. The call appeared on Anderson's phone as having originated from phone number 279-233-1393.

44.     On September 8, 2023, Anderson received a solicitation call from or on behalf of Defendant. The caller again stated that Anderson qualified for "state-regulated final expense insurance" and identified the name US Funeral Expenses. Anderson again advised she was not interested. The call appeared on Anderson's phone as having originated from phone number 279-233-1369.

45.     On September 9, 2023, at approximately 11:56 a.m., Anderson received a solicitation call from or on behalf of Defendant. The caller again stated that Anderson qualified for "state-regulated final expense insurance" and identified the name US Funeral Expenses. Anderson again advised she was not interested. The call appeared on Anderson's phone as having originated from phone number 279-233-1361.

46.     On September 9, 2023, at approximately 12:56 p.m., Anderson received a solicitation call from or on behalf of Defendant. The caller again stated that Anderson qualified for "state-regulated final expense insurance" and identified the name US Funeral Expenses. Anderson again advised she was not interested. The call appeared on Anderson's phone as having originated from phone number 279-233-1388.

47.     On September 11, 2023, at approximately 11:56 a.m., Anderson received a solicitation call from or on behalf of Defendant. The caller again stated that Anderson qualified for "state-regulated final expense insurance" and identified the name US Funeral Expenses. Anderson again advised she was not interested. The call appeared on Anderson's phone as having originated from phone number 279-233-1384.

48.     On September 13, 2023, Anderson received a solicitation call from or on behalf of Defendant. The caller again stated that Anderson qualified for "state-regulated final expense insurance" and identified the name US Funeral Expenses. Anderson again advised she was not interested. The call appeared on Anderson's phone as having originated from phone number 279-233-1366.

49.     On September 15, 2023, Anderson received a solicitation call from or on behalf of Defendant. The caller again stated that Anderson qualified for "state-regulated final expense insurance" and identified the name US Funeral Expenses. Anderson again advised she was not interested. The call appeared on Anderson's phone as having originated from phone number 279-233-1380.

50.     On September 18, 2023, Anderson received a solicitation call from or on behalf of Defendant. The caller again stated that Anderson qualified for "state-regulated final expense insurance" and identified the name US Funeral Expenses. Anderson again advised she was not interested. The call appeared on Anderson's phone as having originated from phone number 279-233-1372.

51.     On October 5, 2023, Anderson received a solicitation call from or on behalf of Defendant. The caller again stated that Anderson qualified for "state-regulated final expense insurance" and identified the name US Funeral Expenses. Anderson again advised she was not interested. The call appeared on Anderson's phone as having originated from phone number 279-233-1381.

52.     On January 12, 2024, Anderson received another call from or on behalf of Defendant. The caller again stated that Anderson qualified for "state-regulated final expense insurance" and identified the name US Funeral Expenses. Anderson again advised she was not interested. The call appeared on Anderson's phone as having originated from phone number 279-233-1366.

53.     On January 15, 2024, Anderson received another call from or on behalf of Defendant. The caller again stated that Anderson qualified for "state-regulated final expense insurance" and identified the name US Funeral Expenses. Anderson

again advised she was not interested. The call appeared on Anderson's phone as having originated from phone number 279-233-1403.

54. On January 12, 2024, Anderson received another call from or on behalf of Defendant. The caller again stated that Anderson qualified for "state-regulated final expense insurance" and identified the name US Funeral Expenses. Anderson again advised she was not interested. The call appeared on Anderson's phone as having originated from phone number 279-233-1366.

55. On January 24, 2024, Anderson received another call from or on behalf of Defendant. The caller again stated that Anderson qualified for "state-regulated final expense insurance" and identified the name US Funeral Expenses. Anderson again advised she was not interested. The call appeared on Anderson's phone as having originated from phone number 279-233-1366.

56. On February 6, 2024, Anderson received another call from or on behalf of Defendant. The caller again stated that Anderson qualified for "state-regulated final expense insurance" and identified the name US Funeral Expenses. Anderson again advised she was not interested. The call appeared on Anderson's phone as having originated from phone number 279-233-1398.

57. On February 21, 2024, Anderson received another call from or on behalf of Defendant. The caller again stated that Anderson qualified for "state-regulated final expense insurance" and identified the name US Funeral Expenses. Anderson again advised she was not interested. The call appeared on Anderson's phone as having originated from phone number 650-680-0115.

58. On February 23, 2024, Anderson received another call from or on behalf of Defendant. The caller again stated that Anderson qualified for "state-regulated final expense insurance" and identified the name US Funeral Expenses. Anderson again advised she was not interested. The call appeared on Anderson's phone as having originated from phone number 479-364-2958.

59. On February 28, 2024, at approximately 4:12 p.m., Anderson received

1   another call from or on behalf of Defendant. The caller again stated that Anderson
2   qualified for "state-regulated final expense insurance" and identified the name US
3   Funeral Expenses. Anderson again advised she was not interested. The call appeared
4   on Anderson's phone as having originated from phone number 530-692-4497.

5   60.    On February 28, 2024, at approximately 4:23 p.m., Anderson received
6   another call from or on behalf of Defendant. The caller again stated that Anderson
7   qualified for "state-regulated final expense insurance" and identified the name US
8   Funeral Expenses. The call appeared on Anderson's phone as having originated from
9   phone number 720-978-1593.

10   61.    Being annoyed by these incessant calls, Anderson decided to feign
11   interest in the product being sold to specifically determine the caller's identity so she
12   could stop the calls.

13   62.    The caller from the call on February 28, 2024 at 4:23 p.m. identified
14   himself as Harry Lynch. Mr. Lynch advised he was interested in providing Anderson
15   final expense insurance.

16   63.    Approximately three minutes after the call began, at 4:26 p.m. Mr.
17   Lynch sent Anderson an e-mail. The e-mail included a red and blue logo for "US
18   Funeral Expenses." The e-mail stated that Mr. Lynch was glad to have discussed
19   "state-regulated (sic) final expense" insurance with Anderson. The e-mail provided
20   Anderson quotes for various levels of final expense insurance ranging from $25,000
21   to $40,000. Mr. Lynch's name appeared in the signature block and identified himself
22   as a "Benefits Co-ordinator/Advocate (CA)" with "US Funeral Expenses."

23   64.    The "US Funeral Expenses" website identifies Defendant as a "partner
24   company."

25   65.    After subsequently speaking with Mr. Lynch, Anderson then received an
26   "Application for Individual Whole Life Insurance" from Defendant. The application
27   identified Defendant's name and Defendant's website and was for a "level death
28   benefit individual who life policy" for $25,000.

66. The application also included an "agent certification," which was signed by Defendant's "agent" and included an "Agent Number" for Defendant's agent.

67. Anderson also received a "premium payment authorization form" from Defendant for a "new application."

68. On information and belief, Anderson may have received additional phone calls from or on behalf of Defendant besides those identified in this Complaint.

## DIRECT AND VICARIOUS LIABILITY

69. Without the benefit of discovery, and because Defendant disclosed its identity, Anderson assumes Defendant directly placed the calls at issue.

70. However, if some or all the calls were made by third-party/parties on behalf of Defendant, in the alternative, Defendant is vicariously liable for those calls.

71. On May 9, 2013, the FCC determined that telemarketers like Defendant cannot avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside of the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain relief. As the FTC noted, because "[s]ellers may have thousands of "independent" marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy.

*In re: Dish Network, LLC,* 28 F.C.C. Rcd. 6574 at 6588 (May 9, 2013) (internal citations omitted).

72. Moreover, the May 2013 FCC ruling rejected a narrow view of TCPA

1    liability, including the assertion that a seller's liability requires a finding of formal

2    actual agency and immediate direction and control over third parties who place a

3    telemarketing call. *Id*. at 6587 n. 107.

4         73.    The evidence of circumstances pointing to apparent authority on behalf

5    of the telemarketer "should be sufficient to place upon the seller the burden of

6    demonstrating that a reasonable consumer would not sensibly assume that the

7    telemarketer was acting as the seller's authorized agent." *Id*. at 6593.

8         74.    If Defendant directly placed the calls at issue to Anderson and the

9    putative class members, Defendant is directly liable for the placing of those calls.

10        75.    However, Defendant may have hired, encouraged, permitted, and

11   enjoyed the benefits of mass telemarketing by third-party telemarketers.

12        76.    If Defendant did not directly place the calls at issue to Anderson and the

13   putative class members, Defendant's third-party telemarketers had actual and/or

14   apparent authority to act on behalf of Defendant.

15        77.    Likewise, Defendant also ratified its agents' violations of the TCPA by

16   accepting insurance premiums from sales imitated by unlawful telemarketing

17   communications.

18        78.    On information and belief, Defendant controlled or had the right to

19   control the marketing activities of those acting on its behalf.

20        79.    Defendant acted as principals to telemarketing agent(s) who were acting

21   on their behalf.

22        80.    Defendant is not permitted under the law to outsource and contract its

23   way out of liability by directing and benefitting from its agents' TCPA violations.

24        81.    For the count identified below, if Defendant directly placed the calls at

25   issue to Anderson and the putative class members, it is directly liable. Alternatively,

26   to the extent any calls were placed by a third-party agent(s) acting on Defendant's

27   behalf, Defendant is vicariously liable for those unlawful communications.

28

CLASS ACTION COMPLAINT                                            - 11 -

## CLASS ALLEGATIONS

82.    Pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3), Plaintiff brings this lawsuit as a class action on behalf of herself and all others similarly situated. This action satisfies the requirements of Rule 23.

83.    Anderson seeks to represent the following class (the "Class"):

For the four-year period prior to the filing of this lawsuit to the date of Class certification, all persons:

(1) who received two or more calls from or on behalf of Defendant during a 12-month period in connection with the marketing of Defendant's products or services;

(2) whose number was registered on the Do Not Call Registry for more than 30 days at the time the calls were received; and,

(3) whose number is registered to an individual and not a business.

84.    Anderson reserves the right to add administrative subclasses, or to amend the definition of the proposed Class, as this lawsuit proceeds.

85.    The members of the proposed Class are so numerous that joinder of all members is impracticable. Anderson reasonably believes that hundreds or thousands of people have been harmed by Defendant's actions. The phone numbers of the members of the proposed Class are readily identifiable through records available to Defendant or those acting on their behalf.

86.    Most members of the proposed Class have suffered damages in an amount such that it would make filing separate lawsuits by individual members economically infeasible.

87.    On information and belief, Defendant has called, and continues to call, people whose numbers are registered on the DNC List. It is reasonable to expect that Defendant will continue to place such calls, absent this lawsuit.

88.    Common questions of law and fact exist as to all members of the

proposed Class and predominate over any questions affecting only individual members. The questions of law and fact common to the proposed Class include, but are not limited to:

a. Whether Defendant's conduct of placing calls to persons whose phone numbers are registered on the DNC List violates 47 U.S.C. § 227(c);

b. Whether the calls were "solicitations," as defined by the TCPA;

c. Whether Defendant maintained and implemented legally sufficient protocols for obtaining consumer "consent" to place telemarketing calls to numbers on the DNC List;

d. Whether Defendant's conduct violates the rules and regulations implementing the TCPA; and

e. Whether Plaintiff and the putative Class members are entitled to increased damages for each violation based on the willfulness of Defendant's conduct.

89.     Plaintiff's claims are typical of the claims of the proposed Class members because her claims arise from the same practice that gives rise to the claims of the members of the proposed Class and are based on the same legal theories.

90.     Anderson and her counsel will fairly and adequately protect the interests of the members of the proposed Class. Anderson's interests do not conflict with the interests of the proposed Class she seeks to represent, and she has retained lawyers who are competent and experienced in class action litigation, TCPA litigation and consumer law.

91.     Anderson's counsel will vigorously litigate this case as a class action, and she and her counsel are aware of their responsibilities to the putative members of the Class and will discharge those duties accordingly.

92.     A class action is superior to all individual lawsuits for this controversy. Joinder of all proposed members of the proposed Class in one action is impracticable, if not impossible, and prosecuting hundreds or thousands of individual actions is not

feasible. The size of individual claims is likely not large enough to justify filing a separate action for each claim. For many, if not most members of the proposed Class, a class action is the only procedural mechanism that will allow recovery. Even if members of the proposed Class had the resources to pursue individual litigation, that method would be unduly burdensome to the courts. Individual litigation could also result in inconsistent adjudications.

93.     In contrast, a class action is superior in that it will benefit the court and litigating parties through efficiency, economy of scale and unitary adjudication resulting from supervision of the litigation by a single court.

94.     Questions of law and fact, particularly the propriety of calls to phone numbers on the DNC List, predominate over questions affecting only individual members.

95.     Defendant has acted or refused to act on grounds that apply generally to the Class, making final injunctive relief or corresponding declaratory relief is appropriate with respect to the Class as a whole.

## COUNT I
### Violations of the Telephone Consumer Protection Act
### 47 U.S.C. § 227(c), *et seq.* (National DNC List Violations)

96.     Anderson incorporates by reference the allegations of the previous paragraphs as if fully stated in this Count.

97.     The TCPA provides that it is a violation of the law for a person whose phone number is registered on the DNC List to receive more than one call on their phone "within any 12-month period by or on behalf of the same entity." *See* 47 U.S.C. §§ 227(c)(1), (c)(5); 47 C.F.R. § 64.1200(c)(ii).

98.     The penalty for each call placed in violation of the TCPA's restrictions on calling phone numbers registered on the DNC List is up to $500 per call and up to $1,500 per call if the violation is determined to be willful. *See* 47 U.S.C. § 227(c)(5).

99.     In addition, the TCPA allows this Court to enjoin Defendant's violations

of the TCPA's regulations prohibiting calls to phone numbers registered on the DNC List. *See* 47 U.S.C. §§ 227(c)(5)(A).

100. By placing calls to Anderson and the putative Class members' phone numbers, which were registered on the DNC List, Defendant violated the TCPA, including, but not limited to, 47 U.S.C. §§ 227(c)(1) and the TCPA's corresponding regulations.

101. Defendant and/or those acting on their behalf knew, or should have known, that Anderson's and the putative Class members' phone numbers were registered on the DNC List.

102. Defendant and/or those acting on their behalf willfully violated the TCPA when placing the calls to Anderson's and the putative Class members' phones.

103. Anderson and the putative Class members are entitled to damages of up to $500 per violation for each call made by Defendant and/or those acting on their behalf that the Court finds violates the TCPA and up to $1,500 per violation if the Court finds that Defendant and/or those acting on their behalf willfully violated the TCPA.

## **PRAYER FOR RELIEF**

WHEREFORE Plaintiff Angela Anderson, individually, and on behalf of all others similarly situated, requests that the Court:

a. Enter an order pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3), certifying the proposed Class, appointing Anderson as the Class representative, and appointing Anderson's counsel as class counsel;

b. Enter judgment in favor of Anderson and the Class members for all damages and other relief available under the TCPA, 47 U.S.C. § 227(c), including injunctive relief, statutory damages of up to $500 per violation, and up to $1,500 per violation if Defendant willfully violated the TCPA;

c. Enter a judgment in favor of Anderson and the Class that enjoins Defendant from violating the TCPA's provisions and regulations;

1        d.     Enter judgment in favor of Anderson and the Class for all applicable pre-

2  judgment and post-judgment interest amounts;

3        e.     Enter judgment in favor of Anderson and the Class for all costs; and

4        f.     Award Anderson and the Class members such further and other relief the

5  Court deems just and appropriate.

6  **DEMAND FOR JURY TRIAL**

7      Please take notice that Plaintiff Angela Anderson demands a jury trial.

8  Dated: October 22, 2024            Respectfully submitted,

9

10                    MILLER SHAH LLP

11                    */s/James C. Shah*

12                    James C. Shah (SBN 260435)

Email: jcshah@millershah.com

13                    Kolin C. Tang (SBN 279834)

Email: kctang@millershah.com

14                    19712 MacArthur Blvd., Suite 222

15                    Irvine, California 92612

Telephone: (866) 540-5505

16                    Facsimile: (866) 300-7367

17                    BUTSCH ROBERTS & ASSOCIATES

18                    LLC

19                    */s/Christopher E. Roberts*

20                    Christopher E. Roberts (phv forthcoming)

21                    Email: CRoberts@butschroberts.com

7777 Bonhomme Avenue, Suite 1300

22                    Clayton, Missouri 63105

23                    Telephone: (314) 863-5700

24

25                    *Attorneys for Plaintiff*

26

27

28

---

CLASS ACTION COMPLAINT                   - 16 -